**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. GLR-20-267** |
| | * | |
| **RONALD ALEXANDER,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| ****** | | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S REQUEST FOR REVIEW OF DETENTION ORDER**

**Introduction**

On August 19, 2020, Ronald Alexander had a detention hearing, during which, the Honorable Judge A. David Copperthite ruled that he must be detained pending trial in this case. ECF 20. Ronald Alexander was previously convicted in this Court for conspiracy to distribute heroin, for which he received a 240 month sentence. *United States v. Ronald Alexander*, SAG-00-242, ECF 13. Alexander now argues for release, and further argues that he should be released temporarily under 18 U.S.C. § 3142(i).

This Court has been consistent in denying release to defendants facing allegation of serious conduct whose release poses an unacceptable risk of flight or danger to the community.[1] And while the Chesapeake Detention Facility (CDF) has had cases of COVID-19 in the past, the government is not aware of any active cases, nor any positive inmate tests in more than a month's time.

Alexander's release would pose an unacceptable risk of nonappearance and an unacceptable risk of danger to the community.

---

1 A list of decisions is included in Appendix A of this response.

**The Detention Hearing and Judge Copperthite's Rulinh**

On August 19, 2020, Judge Copperthite held that Ronald Alexander must be detained. In addition to finding that Alexander could not overcome the presumptions that his release pending trial posed a danger to the community and a risk of nonappearance, Judge Copperthite further found that, even absent any presumption, clear and convincing evidence existed that no combination of conditions existed that could assure the safety of the community. *Id.* Judge Copperthite's decision was influenced by his findings concerning the strong weight of the evidence against the defendant, that the defendant is subject to a lengthy period of incarceration if convicted, and that the defendant has a significant prior criminal conviction history. *Id.*

**Argument**

Ronald Alexander has a serious criminal conviction history that includes a 240 month sentence rendered by this Court for conspiring to distribute heroin. He is now charged with conspiring to distribute heroin and fentanyl, and the evidence against him is very strong. He is a serious risk of flight, for among other reasons, that he is facing a very length prison sentence. And he poses an unacceptable risk of danger to the community: he has been convicted of, and now has been caught again, selling deadly drugs.

**I.     Legal Standards.**

The factors a court must consider when determining whether to release a defendant pending are: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the defendant's previous convictions and the nature of

2

the charges against the defendant, the Government also is entitled to a presumption, under two separate provisions, that no combination of release conditions will assure the safety of the community and the defendant's appearance in court.  *See* 18 U.S.C. §§ 3142(e)(2), (e)(3).

The Bail Reform Act permits the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  The Defendant bears the burden of showing that temporary release is "necessary" under this section.  *See United States v. Dupree*, 833 F. Supp. 2d 241 (E.D.N.Y. 2011); *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020).  In the context of COVID-19, the Fourth Circuit explained that 18 U.S.C. § 3142(i) requires considering "the severity of the risk that the COVID-19 virus poses to the Defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform factors, rises to the level of a 'compelling reason' for temporary release." *United States v. Creek*, CCB-19-36, App. No. 20-4251, ECF 18 at *1 (4th Cir. Apr. 15, 2020).

**II. Offense Conduct and Arrest.**

On May 1, 2020, the Drug Enforcement Administration (DEA) obtained authorization to intercept transmissions made by one of Ronald Alexander's phones.  Soon thereafter, DEA learned that Alexander operated a drug shop that sold narcotics, including heroin and fentanyl, in the area of Spaulding and Palmer Avenues in Baltimore City.  DEA also obtained permission to intercept transmissions from another of Alexander's phones.  Alexander was intercepted speaking with street-level distributors, whom he supplied with drugs.  And Alexander was intercepted speaking with his own supplier, Thomas Crosby, whose phone was also intercepted, and who was charged in the same Indictment.

Alexander's phone calls with his supplier, Crosby, were brief, and they often spoke in code, but it was clear from context and content that the calls were about Alexander purchasing drugs from Crosby.  From May till August, Alexander would purchase drugs from Crosby every 7 to 14 days.  On the phone, Crosby and Alexander would agree to meet at a BP gas station located at the intersection of Druid Park Avenue and Liberty Heights in Baltimore City so that Alexander could buy drugs from Crosby.  Alexander's phone and van were tracked.  And several of these meetings were observed by law enforcement.  For example, on the afternoon of June 22, Alexander and Crosby exchanged messages to meet later that night.  At around 9:13pm, the pair spoke on the phone, and agreed to meet "at the same old place".  At around 9:42 pm, investigators saw Alexander leave his residence at 1203 North Augusta Avenue in Baltimore City, get into his van and drive to the BP gas station.  Alexander parked at a gas pump, but did not get any gas.  Later obtained security camera footage showed that Crosby got out of his car, walked to Alexander's van, and got into his Alexander's van, sitting in the passenger's seat.  Approximately three minutes later, Alexander drove his van up next to Crosby's car, dropped Crosby off, and then left.  Crosby left thereafter.  Tracking data obtained from Alexander's car and cellphone showed that Alexander then proceeded to an area near and including 15 N. Culver Street, where he remained for the night.  15 North Culver Street is a residence at which Alexander stayed from time to time, and where he stashed drugs.

The next morning, on June 23, investigators saw Alexander, wearing a Safe Streets shirt, walk out of the residence at 15 North Culver Street and stand on the porch, holding a plastic bag containing a powdery substance that they identified as probable narcotics.



During the investigation, on August 5, 2020, a Baltimore Police Officer conducted a traffic stop of Ronald Alexander, after Alexander rolled through a stop sign. During the encounter, Alexander used his affiliation with Safe Streets and the Mayor's Office to try to deter any further police investigation, telling the officer that he worked for Safe Streets. Alexander called an associate afterwards, and the call, as intercepted, proceeded in part as follows:

ALEXANDER: Yeah. Police hopped on me. Told me to get off the phone. **You know they scared, you know they scared of the Mayor Office, I said man I work for Safe Streets from the Mayor Office.** I was just coming from one of my participant house, in need with this, it was in need of food due to the pandemic. He say oh, ok ok.

On August 9, following an intercepted phone call between Alexander and Crosby, investigators saw the pair meet at the gas station. This meeting proceeded in the same matter that previous meetings had: Crosby entered Alexander's vehicle, they had a brief conversation, Crosby placed an item in the center console, and then Crosby exited. However, immediately following this meeting, investigators conducted a traffic stop of Alexander's vehicle as he drove away. Once again, during this vehicle stop, Alexander relied on his employment with Safe Streets to hide his criminal conduct. Alexander informed law enforcement that he worked for Safe Streets and provided law enforcement with a letter from the Baltimore Mayor's Office. During a search of the vehicle, investigators recovered a baggie filled with about 100 grams of an off-white powder of suspected heroin/fentanyl.2  When asked what was inside the bag, Alexander stated that it contained drugs that he had taken from a member of the community as part of his role with Safe Streets.

Alexander was permitted to leave without being arrested. After the traffic stop, Alexander immediately called Crosby. The pair then met again at the same gas station. After this meeting, Crosby disposed of his cell phone.

On August 14, 2020, investigators executed a series of search and arrest warrants at various locations related to the investigation, including Alexander's residence, 1203 North Augusta Avenue, Baltimore City and another residence at which Alexander stayed, 15 N. Culver Street, Baltimore City. Ronald Alexander was located at 1203 North Augusta, as were: a digital scale; a vacuum sealer and seal bags; a Hi-point model 09 9mm Luger firearm; white powder of suspected cutting agent, weighing about 75 grams, located in a screw-shut container; more white powder of suspected cutting agent, located in a screw-shut container, and labeled Quinine HCI

---

2 The lab results for this seizure are outstanding.

$C_{20}H_{24}N_2O_2HCI$ (a known cutting compound); and Safe Streets apparel.  Located at 15 N. Culver Street was over 80 grams of heroin and fentanyl mixture; over 100 grams of powdered caffeine; and a digital scale.

### II. There is a Presumption that Ronald Alexander be Detained, and an Analysis of the § 3142 Factors Weigh Heavily in Favor of Detention.

Following a previous conviction for conspiring to distribute heroin for which he received a 240 month sentence, Ronald Alexander has been charged with conspiracy to distribute heroin and fentanyl in violation of 21 U.S.C. § 846.  Accordingly, the Bail Reform Act provides that there is a presumption in favor of detention both because of the danger Alexander's release would pose to the community and his risk of flight.  Additionally, even if there were not a presumption in place, each of the § 3142 factors weigh in favor of the defendant's detention.

#### A. The Nature and Circumstances of the Offense

After serving a lengthy prison sentence for selling heroin, and following two other, prior drug convictions, Alexander was running a drug shop in Baltimore City, supplying heroin and fentanyl to street level distributors.  The defense motion makes much of the notion that Alexander is not accused of committing any violence.  This completely misses the point:  heroin and fentanyl are incredibly dangerous substances that claim more lives each year than homicides.  In 2018, the most recent year for finalized CDC data, more than 67,000 people died of drug overdoses.[3]  This is more than 4 times the number of homicides from that year, 16,214.[4]  According to the CDC, the increased overdose deaths in recent years, as compared to historical totals, is driven by synthetic opioids, such as fentanyl, which Alexander supplied along with heroin for public consumption.[5]

---

[3] https://www.cdc.gov/drugoverdose/data/statedeaths.html
[4] *Uniform Crime Reports, FBI, Table 1*, https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-1 .
[5] *Drug Overdose Deaths in the United States, 1999-2017* at 4, https://www.cdc.gov/nchs/data/databriefs/db329-h.pdf .

This makes sense.  Depending on its composition, fentanyl is about 50 times more powerful than heroin.6  Sadly, the trend in Maryland is as or more stark:  2,143 people died of opioid overdoses in the state in 2018, with 1,888 of that total due to fentanyl and 830 further due to heroin.  This is compared with only 263 non-opioid deaths.7

Alexander was caught by the DEA selling deadly drugs on the streets, following a conviction for doing the same in this Court.  What makes it worse is that Alexander was given another chance in the form of employment with Safe Streets.  He was supposed to assist in the City's efforts to reduce crime.  Instead, he committed more crimes.  And he used his association with Safe Streets to attempt to shield himself:  by twice telling police about his role at Safe Streets to attempt to avoid detection.  Alexander even claimed that the dangerous and deadly drugs he had just purchased from Crosby, that he intended to process and provide to his distributors to be sold to the public, were obtained by him to try to help make Baltimore safer through his role with Safe Streets.

Alexander's conduct was dangerous.  He was obtaining hundreds of grams of fentanyl and heroin from Crosby for sale at his drug shop.

### B. Weight of the Evidence

As detailed above, the weight of the evidence against the defendant is very strong.  The DEA conducted an exhaustive and thorough investigation that included surveillance, tracking warrants, wiretaps, and drug seizures.  The defense motion acknowledges that the weight of the evidence is strong.  Motion at 3-4.

---

6 *Drugs of Abuse*, *A DEA Resource Guide 2017 Edition* at 40
https://www.dea.gov/sites/default/files/sites/getsmartaboutdrugs.com/files/publications/DoA_2017Ed_Updated_6.16.17.pdf#page=40 .
7 *Maryland Department of Health, Unintentional Drug and Alcohol-Related Intoxication Deaths in Maryland, 2018,*
https://bha.health.maryland.gov/Documents/Annual_2018_Drug_Intox_Report.pdf .

### C. History and Characteristics of the Person

The defendant is a repeated drug offender who received a 240 month sentence from this Court and responded by re-offending with the same crime of conspiracy to distribute deadly opioids. The defense motion notes that Alexander was employed at the time of arrest. But Alexander used his employment and association with the local government as a shield to protect his criminal conduct. Alexander's employment cannot be counted in his favor.

### D. The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release.

The defendant is a repeat offender. As detailed above, fentanyl and heroin are our nation's and state's most deadly drugs. Alexander's release to the community would pose an unacceptable risk of danger.

## III. The Defendant Cannot Meet His Burden to Show that Temporary Release is "Necessary" Under 18 U.S.C. §3142(i).

The Defendant's obesity and heart condition do not supply him with a sufficient basis for "necessary" relief in the form of "temporary release" under 18 U.S.C. § 3142(i). The Defendant bears the burden of showing that temporary release is necessary under this section. *See United States v. Dupree*, 833 F. Supp. 2d 241 (E.D.N.Y. 2011); *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020). Evaluating a motion under § 3142(i) requires considering "the severity of the risk that the COVID-19 virus poses to the Defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform factors, rises to the level of a 'compelling reason' for temporary release." *United States v. Creek*, CCB-19-36, App. No. 20-4251, ECF 18 at *1 (4th Cir. Apr. 15, 2020).

Judges in this district have denied requests for temporary release under § 3142(i) based on the COVID-19 pandemic, including for defendants housed at CDF, as the Defendant is.8

For example, in *United States v. Green*, CCB-19-0539 (D. Md. Apr. 15, 2020) (Order by Judge Coulson), the court addressed a § 3142(i) temporary-release request by an inmate at the Central Detention Facility in D.C. (CTF) who had "underlying health conditions of asthma, high blood pressure and chronic obstructive pulmonary disease[,] putting him at particular risk for complications should he contract [COVID-19]." *Id*. at 2. The court found that notwithstanding the defendant's underlying health conditions, the other factors weighed against release. *First*, the original reasons for detention were "strongly in the Government's favor." *Second*, the defendant's poor performance on community supervision in the past raised concerns "not only that he would comply with release conditions, but also that he would comply with advice from public officials and public health experts regarding COVID-19 precautionary measures." Id. at 6. *Finally*, the court found that the family members whom the defendant proposed as third-party custodians were not "appropriate person[s]" within the meaning of § 3142(i) who could ensure the defendant's compliance with conditions of release. *Id*. at 6–7.9

---

8 *See United States v. Brown*, No. CCB-19-576, 2020 WL 1554059 (D. Md. Apr. 1, 2020) (Order by Judge Copperthite) (finding that § 3142(i) "relates to temporary release to the U.S. Marshals or other authority for situations such as funeral attendance or other limited specific reasons, not the pandemic outbreak of COVID-19"); *United States v. Moran*, No. SAG-19-0585, 2020 WL 1663366 (D. Md. Apr. 3, 2020) (Order by Judge Copperthite) ("It is this Court's position that 3142(i) is reserved for very limited purposes such as funeral attendance or other law enforcement (USMS) supervised activity, not release during a pandemic."); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms) (denying motion for pretrial release by a detainee who "suffered an aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection"); *Gallager*, SAG-19-479 (D. Md. May 22, 2020) (Gallagher, J.) (denying release under § 3142(i) for defendant detained at CDF).

9 Courts in other districts have agreed that generalized claims about COVID-19—whether centered on the risk of becoming ill from the disease, or unavoidable disruptions in access to

Here even assuming the Defendant's weight and heart condition place him at an increased risk of complications from a COVID-19 infection, all other required considerations cut against the defendant. The evidence is very strong. The defendant's crimes were incredibly serious and dangerous. The defendant has a lengthy criminal history of the same types of conduct. And, perhaps most importantly, the defendant's release would pose an unacceptable risk of nonappearance and an unacceptable risk that he would engage in more offending in the form of selling deadly drugs for public consumption. Moreover, the Defendant's willingness to flout the law, and abuse his position of trust with Safe Streets, demonstrates an increased risk. Nothing about the defendant's history and characteristics suggests he would follow applicable healthy and safety guidance if he were released.

---

counsel during the pandemic—do not constitute compelling reasons justifying temporary release under § 3142(i). *See, e.g.*, *United States v. Joshua White*, No. 19-mj-00203 (DAR) (D.D.C. Apr. 2, 2020) (finding that COVID-19 outbreak in D.C. facility where defendant was housed was not a "compelling reason" supporting release under § 3142(i) where defendant did "not claim to have health conditions or other circumstances that make him particularly vulnerable to the virus," and cited only generalized risks that "apply to all incarcerated individuals"); *United States v. Lee*, No. 19-cr-298 (KBJ), 2020 WL 1541049 (D.D.C. Mar. 30, 2020) ("[T]his Court agrees with those recent precedents that have rejected emergency motions for release of otherwise healthy and potentially violent defendants based solely on the generalized risks that COVID-10 admittedly creates for all members of our society."); *United States v. Chambers*, No. 20-CR-135 (JMF), 2020 WL 1530746 (S.D.N.Y. Mar. 31, 2020) (finding that temporary release was not "necessary" for the preparation of the defense where defendant's pretrial conference was "not even scheduled for another month"); *United States v. Anderson*, No. 19-CR-771 (S.D.N.Y. Mar. 27, 2020) (finding that the risk of contracting COVID-19 was not a "compelling reason" justifying temporary release under § 3142(i) where defendant was a "healthy 40-year-old man, with no unusual medical conditions"); *United States v. Clark*, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) (denying release based on individualized assessment of § 3142(g) risk factors, even though defendant had diabetes, and finding that "a defendant should not be entitled to temporary release under § 3142(i) based solely on" COVID-19 concerns); *United States v. Cox*, No. 2:19-cr-00271, 2020 WL 1491180, at *2 (D. Nev. Mar. 27, 2020) (rejecting request for temporary release under § 3142(i), finding that danger to the community outweighed risk presented by COVID-19 for 60-year-old defendant with diabetes, and jail's temporary suspension of in-person legal visits did not render release necessary for preparation of the defense).

Moreover, the hypothetical risk of infection with COVID-19 is not based on any identifiable problem associated with Alexander's current conditions of confinement. CDF has had infections in the past, but the government is not aware of any current cases.

## Conclusion

The Defendant must be detained pending trial. A presumption of detention applies, and there exists no set of conditions that can reasonably assure the defendant's appearance and protect the community. And the Defendant cannot meet his burden of showing any term of temporary release is necessary.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/
Daniel A. Loveland, Jr.
Matthew DellaBetta
Assistant United States Attorneys

**Appendix A**

- *United States v. Martin*, PWG-19-140 (D. Md. Mar. 3, 2020), ECF 209 (Order by Judge Grimm).
- *United States v. Blue,* ELH-19-0286 (D. Md. Mar. 31, 2020), ECF 413 (Order by Magistrate Judge Gesner).
- *United States v. Ashley,* RDB-06-0034 (D. Md. Apr. 6, 2020), ECF 107 (Order by Judge Bennett).
- *United States v. Jones*, RDB-18-0339 (D. Md. Apr. 17, 2020), ECF 588 (Order by Judge Bennett).
- *United States v. Gollahon*, DKC-19-257 (D. Md), ECF 85 (Order by Magistrate Judge Copperthite).
- *United States v. Hackett*, GLR-18-0086 (D. Md), ECF 144 (Order by Judge Russell).
- *United States v. Crosby*, ELH-19-268 (D. Md), ECF 415 (Order by Magistrate Judge Copperthite).
- *United State v. Gallagher*, SAG-19-479 (D. Md.), ECF 14 (Order by Magistrate Judge Boardman).
- *United States v. Anderson*, ELH-19-302 (D. Md.), ECF 79 (Order by Judge Hollander).
- *United States v. Hill*, TDC-20-046 (D. Md.), ECF 144 (Order by Magistrate Judge Copperthite).
- *United States v. Legard*, PWG-19-0137 (D. Md.), ECF 520 (Order by Judge Grimm).
- *United States v. Ellison*, ELH-19-286 (D. Md.) , ECF 427 (Order by Judge Copperthite).
- *United States v. Waller*, GLR-19-86 (D. Md.), ECF 143 (Order by Judge Russell).
- *United States v. Solomon*, ELH-10-286 (D. Md.), ECF 454 (Order by Magistrate Judge Copperthite).
- *United States v. Gallagher*, SAG-19-479 (D. Md.), ECF 34 (Order by Judge Gallagher).
- *United States v. Thompson*, PWG-19-604 (D. Md.) (Order by Judge Coulson);
- *United States v. Speed*, CBD-20-1180 (D. Md.), ECF 21 (Order by Judge Hollander);
- *United States v. Morris*, ELH-19-286 (D. Md.), ECF 528 (Order by Judge Boardman);
- *United States v. Fomukong*, PWG-17-661 (D. Md.), ECF 220 (Order by Magistrate Judge DiGirolamo).
- *United States v. Jones*, ELH-19-280 (D. Md.), ECF 220 (Order by Magistrate Judge Coulson).